UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| Continental Petroleum Corporation, Inc. and Plastitex, S.A. | § § § | |
| Plaintiffs, | § § § | CIVIL ACTION NO.:11-cv-7801 |
| v. | § § | |
| Corporate Funding Partners, LLC and Pablo Antoniazzi, an individual, Caren Raphael, Joseph Lau, Green Pampas, Inc. | § § § § § | |
| Defendant | § § | |

PLAINTIFF'S FIRST AMENDED COMPLAINT

1. Parties and Service

1.0     The allegations contained within this complaint are in reference to the following individuals, entities, or persons.

1.1     Plaintiff, Continental Petroleum Corporation, Inc. is a foreign corporation, which was organized in Peru.

1.2     Plaintiff, Plastitex, S.A. is a foreign corporation, which was organized in Paraguay.

1.3     Defendant, Pablo Antoniazzi is an individual and a citizen of the State of Florida. Plaintiffs are currently attempting to locate Mr. Antoniazzi, however have been unable to do so. It is believe that Green Pampas, Inc. has information as to his whereabouts.  Service will be attempted again using the last known address that Plaintiffs are able to locate.

1.4     Defendant, Corporate Funding Partners is a limited liability corporation that is incorporated under the laws of the State of New York.  Defendant has its principal place of business in the State of New York.  Defendant has previously been served with process, and its attorneys have made an appearance in this matter.  They will be served via the DC/ECF system.

1.5     Defendant, Joseph Lau is a Corporate Officer of Corporate Funding Partners and is being sued in his individual capacity.  Defendant has previously been served with process, and

his attorneys have made an appearance in this matter.  They will be served via the DC/ECF system

1.6      Defendant, Caren Raphael is a Corporate Officer of Corporate Funding Partners and is being sued in her individual capacity.  Defendant has previously been served with process, and her attorneys have made an appearance in this matter.  They will be served via the DC/ECF system

1.7      Defendant, Green Pampas, Inc, is a Delaware Corporation.  Defendant has its principal place of business in the State of Florida.  Defendant has previously been served with process, and its attorneys have made an appearance in this matter.  They will be served via the DC/ECF system

1.8      The Defendants are subject to nationwide service or process under the provisions of RICO, 18 U.S.C. § 1965.  The Second Circuit has determined that Section 1965(b) confers nationwide jurisdiction to RICO cases.  (See *PT United Can Co v. Cron Cork & Seal Co.,* 138 F3d 65, 71 (2d Cir. 1998).  The statute requires personal jurisdiction based on minimum contacts with the forum state as to at least one defendant in the RICO Defendant then jurisdiction is proper as to all other defendants if the "ends of justice require." "[A] civil RICO action can only be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant."; *PT United Can Co. Ltd.* 138 F.3d 65, 70 (2d Cir. 1998).  The RICO jurisdiction then extends beyond that party. "[T]he 'ends of justice' is a flexible concept uniquely tailored to the facts of each case." *Cory v. Aztec Steel Building, Inc.*, 468 F.3d 1226, 1232 (10th Cir. 2006), cert. denied, 127 S.Ct. 2134 (2007). The "ends of justice" provision has been interpreted as limiting the instances of national service of process to those cases in which (1) the court has jurisdiction over at least one of the parties pursuant to 18 USC § 1965(a) and (2) the plaintiff cannot otherwise obtain personal jurisdiction over all alleged co-conspirators in one forum. See *Faircloth v. Jackie Fine Arts, Inc.,* 682 F Supp 837 (D SC 1988); *Abeloff v. Barth,* 119 FRD 315 (D Mass 1988); *Butcher's Union Local No. 498 v. SDC Investment, Inc.,* 788 F2d 535 (9th Cir 1986).

1.9      The only Defendants not located in New York are Green Pampas, and Antoniazzi.  No other jurisdiction is available to combine this cause into one matter.  Absent the RICO provisions this matter would be parceled out and not heard in one forum.  Plaintiffs are unaware of any other jurisdiction where this matter could be heard in its entirety, and no other parties have articulated one.

## 2.  Jurisdiction & Venue

2.0      This action arises under the Racketeer Influenced and Corrupt Organizations Act of 1970, 18 U.S.C. Section 1961 ("RICO"), and the laws of New York.  Plaintiffs seek to recover compensatory and punitive damage sustained, as a result of the Defendants' conduct, along with the costs of this suit, interest and reasonable attorney's fees.  The court's  jurisdiction is invoked under 28 U.S.C. § 1331, 28 U.S.C. § 1332, 28 U.S.C. § 1337, 18 U.S.C. § 1964(c), and the doctrine of pendent jurisdiction.

2.1     Venue:  Venue is proper in this District under 28 U.S.C. § 1391 (b) and 9(c).  A substantial part of the events and conduct giving rise to the violations of law complained of herein occurred in or emanated from this District.  In addition, Defendants continue to conduct regular business with consumers in this District.

### 3.  Conditions Precedent

3.0     All conditions precedent to recovery have been performed, have occurred, or have been otherwise excused.

### 4.  Facts

#### The Continental Petroleum Corporation Transaction

4.0     On April 11, 2008 Plaintiff Continental Petroleum Corporation entered into a Sales and Purchase Agreement with Loxistica Integral  Do Palet S.I. for 150,000 metric tons of a certain quality of Urea.  The Urea was to be delivered in twelve monthly increments of 12,500 metric tons (MT) beginning on June 1, 2008.  The payment for each shipment of Urea was to be $2,537,500.00.  Mr. Freddy Gambarizio the president of Continental Petroleum Corporation ("Continental") turned to Corporate Funding Partners ("Funding") to secure a letter of credit to fund this transaction.  The documents related to this transaction and the Continental dealings with Funding are attached hereto as Exhibit A and incorporated herein by reference in their entirety as if full set forth verbatim herein.  These documents are bates numbered from CPC_0001-CPC_0076, and hereafter for the sake of brevity will be referred to by bates number.

4.1     Funding was located at www.lettercredit.com.  Based on the website a Mr. Pablo Antoniazzi was the representative for South America.  As Continental is located in Lima, Peru, Mr. Antoniazzi was the representative or agent for Continental petroleum for this transaction.  Documentation was exchanged to begin the credit application process.

4.2     Mr. Freddy Gambirazio, the owner of Continental Petroleum Corporation informed Corporate Funding Partners that he and his corporation did not have the capital, the knowledge or skill to obtain a letter of credit directly through a bank or on its own.  Further Mr. Gambirazio informed Pablo Antoniazzi, Caren Raphael, and Joseph Lau, that he had no previous experience with dealing in letters of credit and that he would be counting on Corporate Funding Partner's expertise and financing to effectuate the transaction.  On May 9, 2008 Continental began filling out forms that had been drafted by Funding and that Funding required in order to issue a letter of credit. These documents included the following;

a)   The L/C Application (CPC_0018),

b)   Visual Representation of Transaction (CPC_0016),

c)   Letter of Credit Compliance Questionnaire (CPC_0057).

4.3     The forms listed in the paragraph above had various attachments but generally all of the above and their attachments formed a set of documents. This set of documents consisted of forms generated by Funding and the transactional documents that Continental submitted to Funding to verify the transaction and its terms.  These documents were transferred back and forth using wire and/or mail between the Corporate Funding, Lau, Raphael, and Continental Petroleum Corporation.

4.4     The L/C Application (CPC_0018) attachments were incorporated into this document based on the incorporation clause contained in the "Special Conditions" section of the form, and in the "Documents Required" section of the form.  The attachments that Funding required included the "Signed Commercial Invoice."  Continental complied and attached the "Proform-Invoice" dated April 28, 2008.  This document included a description of the type of letter of credit required, and states in pertinent part, "TERMS OF PAYMENT IRREVOCABLE, CONFIRMED, TRANSFERABLE, AT THE SIGHT 100% PAYABLE DOCUMENTARY LETTER OF CREDIT TOP 25/50 WORLD BANK." (CPC_00014-15).  Corporate Funding Partners represented to Continental Petroleum Corporation that they needed the contract documents from the underlying transactions to ensure that the letter of credit issued complied with the contract requirements.

4.5     Continental Petroleum complied and sent via mail or wire the April 11, 2008 Contract which contained language similar to that quoted above, and which clearly informed Funding, who is in the business of letters of credit, that this particular letter was to be confirmed and drawn upon a top 25 bank.   The Contract states "DOCUMENTARY, IRREVOCABLE, CONFIRMED, TRANSFERABLE, DIVISIBLE, SHIPMENTS FOR SHIPMENTS LETTER OF CREDIT, PAYABLE AT SIGHT AGAINST THE PRESENTATION OF CLEAN SHIPPING DOCUMENTS AS PER CONTRACT TO BUYER BANK NON PARTIAL PAYMENT, NON PARTIAL SHIPMENT" (CPC_0001-13)

4.6     In addition to the forms drafted by Funding there was one form drafted by First American Bank, called the Application for Import Letter of Credit (CPC_0045- bullet 1 of the Documents Section of the letter).   This document was signed along with all of the other application information and sent back to Funding.  This document too had as an attachment the Proform Invoice containing the provision that the Letter of Credit be a confirmed letter, and from a top 25/50 world bank (CPC_0014).  This is the exact same form that has been used in prior fraudulent transactions involving customers of Corporate Funding Partners (See e.g. *Great Eagle International Trade, Ltd., et al., v. Corporate Funding Partners*, LLC., et. al., In The Supreme Court of the State of New York, Index No. 12394/10).

4.7     On or about May 13, 2008 the funds required to issue the Letter of Credit were paid in the amount of $107,315.63 (CPC_0023).

4.8     Banco Pastor, Loxistica's bank, received the Letter of Credit on May 30, 2008.   The letter was not confirmed and it was rejected.   As a result the June 1 shipment date was missed and Loxistica cancelled the contract (CPC_0029).

4.9     Upon discovering this Mr. Gambirazio requested explanation from Funding and was informed by Antoniazzi that a U.S. Bank did not need to confirm its Letter of Credit, as it is a U.S. Currency.   This explanation did not satisfy the seller, and further appeals to Loxistica were to no avail.   In fact, the information supplied by Mr. Antoniazzi was completely false.   The American Dollar being used as the currency has no bearing on the confirmation of a Letter of Credit.

4.10    Antoniazzi then proposed that he could find a supplier of Urea who would be able to accept a Letter of Credit like the one previously issued.   Mr. Antoniazzi represented that Trifecta Trading (165) PTY Ltd., a South African Company, would be able to meet the Urea supply requirements and also meet all the conditions to be a supplier of Urea in the international marketplace.

4.11    Continental relied upon Antoniazzi's representations and the fact that he stated that he was currently doing Urea business with Trifecta Trading, and entered into a Sales and Purchase Agreement with Trifecta on June 27, 2008.  (CPC_0031-39).

4.12    On July 8, 2008 Continental re-applied for a second letter of credit, and paid a second fee of $107,315.62. (CPC_0040). The letter was allegedly accepted by the seller Trifecta's bank, but the product was never delivered.

4.13    Antoniazzi then schemed to have Continental attempt a third transaction with one of his own corporations, Green Pampas, Inc., a Delaware Corporation.   Continental thought better of throwing additional monies away (CPC_0071).   Antoniazzi, has been identified as the Chief Executive Officer of Green Pampas, and Grupo Beraza Hermanos, Inc., d/b/a Green Pampas, Inc. Mr. Antoniazzi held himself out as an agent with authority to act for Green Pampas, Inc.

4.14    As a result of the above courses of action, Plaintiff Continental suffered damages.

<u>The Plastitex Transaction</u>

4.15     Plastitex similarly learned of Funding through their website www.lettercredit.com. Plastitex was also trying to effectuate a transaction in Urea.  The documents related to this transaction and the Plastitex dealings with Funding are attached hereto as Exhibit B and incorporated herein by reference in their entirety as if full set forth verbatim herein.  These documents are bates numbered from Plas-1 through Plas-73, and hereafter for the sake of brevity will be referred to by bates number.  Plastitex informed Corporate Funding Partners that it would require a letter that conformed to the requirements of their transaction.

4.16     Plastitex's transaction with Corporate also required a confirmed letter of credit, with a top 25 world bank. Note that these are the same material terms that were required in the Continental Petroleum transaction. Corporate Funding Partners represented that it could and would issue a letter that complied with the confirmation requirement, as well as the top 25 world bank requirement. On **April 14, 2008**, Plastitex paid $125,562 to open a letter of credit in the amount of $2,973,500.00 through First American Bank. (Plas-1, and Plas-6) The letter was to be irrevocable, divisible, transferrable, and confirmed by a top 25 world bank. (Plas-1, 6, 7) The letter of credit issued was not confirmed, and was rejected by Bancaja, the Urea supplier's bank. (Plas-1, 6, 7)  This was a material condition to this contract between Corporate Funding Partners and Plastitex.  As in the Continental transaction there was no top 25 world bank nor was there a confirmed letter of credit issued.

4.17     Antoniazzi was the Corporate Funding Partners representative for Plastitex and Corporate Funding, Lau, Raphael, Green Pampas and Antoniazzi, endeavored to perform exactly the same scheme as they had with Continental Petroleum Corporation.  Antoniazzi represented that he had a supplier who could meet the requirements of Plastitex's contract and provide the Urea of the type quality and form required by the Plastitex transaction. Further that this supplier would accept a letter of credit like the kind that was issued in the previous transaction.  Trifecta Trading 165 PTY LTD was the suggested supplier. (Plas 25-31).  Antoniazzi facilitated the contract for the requirements of Urea, and then allegedly arranged for the Funding.

4.18     On **July 11, 2008** Trifecta allegedly accepted the Corporate Funding Partners Letter of Credit.  (Plas-36).  On **July 14, 2011** the LC was funded (Plas-37-38) Some 22 days later Trifecta changed their story and insisted that the letter had a minor mistake that it needed a variance of +/- 5% and it would cost $8,950 to correct it. (Plas-10-11, and Plas -18).   On September 3, 2008 more consideration was paid to obtain this variance. (Plas-54).  This flew in the face of Trifecta's assertion that they had started the Proof of Product (POP) issuance process on August 4, 2008 (Plas-46).

4.19     More letters were exchanged and requests for information were sent, but Trifecta double talked until the final admission on October 3rd, 2008 when it admitted that they have no Urea supply. Plas-59.

4.20     Just like with the prior Continental transaction, Plastitex was offered to do business with Green Pampas, Inc., Antoniazzi's own corporation.  Unfortunately Plastitex attempted to save their business transaction and paid even more money.  On January 20, 2009 Plastitex and Green Pampas entered into a contract for the sale of Urea.  As one can imagine, they did not have any urea, and Corporate Funding Partners was paid for another useless LC. No Urea was delivered, however no reasonable explanation was offered.

4.21     **Continental Petroleum Corporation** was also offered a deal with Antoniazzi's company, Green Pampas.  (CPC_0061-70).  This offer displayed a date of April 13, 2009.  Two facts are displayed as a result of this documentation. On the documents presented in this petition alone, Antoniazzi can be shown to have lied about the lack of necessity for confirmation of a letter of credit when U.S. Dollars are used, as his Green Pampas contract calls for the currency in U.S. Dollars and a Confirmed letter of credit.  The second fact displayed is the knowledge that Green Pampas had no Urea to deliver and yet he attempted to bring **Continental** into another transaction knowing that his company would breach, but also that he would receive commissions on the monies spent for the LC through Corporate Funding Partners.  Antoniazzi was an agent of both Green Pampas, Inc. as an officer in their corporation, and for Corporate Funding Partners.

### 5.  Plastitex Count 1(a) Breach of Contract (Green Pampas and Corporate Funding Partners)

5.0     The preceding paragraphs are incorporated verbatim herein by reference as if set forth in their entirety.

5.1     Plastitex and Corporate Funding Partners executed a written contract which provided for a payment of funds in return for the issuance for a letter of credit that conformed to certain defined terms; namely that it be confirmed and drawn upon a top 25 world bank. Plastitex has performed its obligations under the contract.  Corporate Funding Partners, however, did not perform its contractual obligations.  Specifically, Corporate Funding Partners failed to provide a confirmed letter of credit drawn upon a top 25 world bank.  Defendant's nonperformance is a breach of the parties' contract, and from that breach Plastitex suffered damages.

5.2     Plastitex and Green Pampas, Inc. executed a written contract.  The contract provided for a payment of funds in return for the delivery of Urea. Plastitex has performed its obligations under the contract.  Green Pampas, Inc., however, has not performed its contractual obligations. Specifically, Green Pampas, Inc. failed to provide the Urea.  Defendant's nonperformance is a breach of the parties' contract, and from that breach Plastitex suffered damages.

### 6.  Continental Petroleum Corporation: Count 1(b) Breach of Contract

6.0     The preceding paragraphs are incorporated verbatim herein by reference as if set forth in their entirety.

6.1     Continental and Corporate Funding Partners executed a written contract. The contract provided for a payment of funds in return for the issuance for a letter of credit that conformed to

certain defined terms, one of which was that it be confirmed. Continental has performed its obligations under the contract. Corporate Funding Partners, however, has not performed its contractual obligations. Specifically, Corporate Funding Partners failed to provide a confirmed letter of credit. Defendant's nonperformance is a breach of the parties' contract, and from that breach Continental suffered damages.


### 7.  Plastitex: Count 2(a) Fraud/Fraudulent Inducement

7.0      The preceding paragraphs are incorporated verbatim herein by reference as if set forth in their entirety.

7.1      To state a cause of action for fraud under New York law a "plaintiff must allege a representation of material fact, the falsity of the representation, knowledge by the party making the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury." *Lemer v. Fleet Bank, N.A.*, 459 F3d 273, 290 (2d Cir. 2006)

7.2      Corporate Funding Partners, Antoniazzi, Lau, and Raphael all knew that the letters of credit to be issued were to be confirmed and drawn upon a top 25 world bank for Plastitex. They represented that the Letter of Credit would conform to the transactional requirements, which had been disclosed to them. Corporate Funding Partners, Antoniazzi, Lau, and made these representations to Plastitex knowing that they were false with the intent to induce Plastitex to pay funds. The terms confirmed and drawn upon a top 25 world bank of the letter of credit were material elements of the transaction. Based upon these false and fraudulent representations Plastitex entered into the transaction and as a result experienced pecuniary loss. Plastitex's reliance upon these representations was justified because the Defendants named above held themselves out to be experts in the Letter of Credit business, and had made *State of New York v Industrial Site Servs.*, Inc., 52 AD3d 1153, 1157 [2008].

7.3      Green Pampas, Inc., and Pablo Antoniazzi together and in conspiracy with the other actors identified in Paragraph 7.2 perpetrated fraud against Plastitex. Antoniazzi and Green Pampas knew that they could not obtain Urea for the transaction with Plastitex. Antoniazzi and Green Pampas represented that were supplies of Urea of the type and quality that could fulfill the requirements of the Plastitex requirements contract. Antoniazzi, an agent with real or apparent authority to transact both the business of Corporate Funding Partners, and of Green Pampas, knew that Green Pampas would not be able to supply urea. Antoniazzi represented that Green Pampas would be able to provide the urea to Plastitex orally shortly before the execution of the agreement, and also in writing in the form of the Plastitex-Green Pampas Contract (Bates No. Plas. 60-64). Plastitex's research turned up Green Pampas's website reflects information about Urea production systems that it markets, taken with their representations makes Plastitex's reliance upon them justifiable. Especially so when considering that Antoniazzi was representing that he was an expert in Letters of Credits to fund these transactions, as well as being able to provide the supply of Urea.

7.4      As a result of the actions of Green Pampas and Antoniazzi, Plaintiff Plastitex suffered damages.

### 8.  Continental Petroleum Corporation: Count 2(b) Fraud/Fraudulent Inducement

8.0      The preceding paragraphs are incorporated verbatim herein by reference as if set forth in their entirety.

8.1      Corporate Funding Partners, Antoniazzi, Lau, and Raphael all knew that the letters of credit for the Continental Petroleum/Loxistica contract were to be issued with at least two material terms. Namely, the letter of credit was to be confirmed and drawn upon a top 25 world bank.  Corporate Funding Partners, Antoniazzi, Lau, and Raphael represented that the Letter of Credit would conform to the transactional requirements, which had been disclosed to them. Corporate Funding Partners, Antoniazzi, Lau, and made these representations to Continental knowing that they were false with the intent to induce Continental to pay funds.  Continental Petroleum had explained to Corporate Funding Partners, Antoniazzi, Lau, and Raphael that they were relying on their skill and knowledge to issue a letter that conformed to the known requirements of the transaction.  Reassurances were made by Corporate Funding Partners, Antoniazzi, Lau, and Raphael that Continental's reliance was justified.  These reassurances came in the form of oral representations, their statements on their corporate websites, and shortly before the issuance of the letter Continental confirmed with Corporate Funding Partners, Antoniazzi, Lau, and Raphael that the letter would be of a type that conformed to the transaction. Based upon these false and fraudulent representations Continental entered into the transaction and as a result experienced pecuniary loss.  *State of New York v Industrial Site Servs.*, Inc., 52 AD3d 1153, 1157 [2008]

8.2      Corporate Funding Partners, Antoniazzi, Lau, and Raphael committed Fraud in a second instance when they connected Continental Petroleum with Trifecta.  In that transaction, Antoniazzi and Corporate Funding Partners assumed the role of supply.  Antoniazzi represented that he had a friend's company who could provide the required Urea.  Antoniazzi knew that Trifecta had no urea to deliver, and on behalf of Corporate Funding Partners attempted to "save the transaction."  Antoniazzi supplied here both the letter of credit, and through his alleged relationship with Trifecta the Urea.  Corporate Funding issued another letter of credit.  Even though Antoniazzi effectuated the contract, knew the parties, and represented that Trifecta would accept a letter just like the one that failed to conform to the requirements of the previous transaction, Trifecta rejected the letter of credit because it lacked a variance, and Continental Petroleum Corporation was again defrauded of additional monies in excess of the amounts to open the initial letter for the Trifecta contract.  All throughout Antoniazzi represented that he knew the business of Urea from his friends and his company, Green Pampas, and through his dealings with Trifecta.  All throughout Antoniazzi represented that he, and the company that he represented, Corporate Funding Partners, were experts in the funding world, and in letters of credit specifically.

8.3      Relying on these representations, and justifiably so given the information available on the Corporate Funding Partners and Green Pampas websites, Continental Petroleum entered into the second contract with Corporate Funding Partners, to provide a second Letter of Credit, and entered into a second Urea supply contract with Trifecta Trading.

### 9.  Continental and Plastitex Count 3: Violations of Racketeer Influenced Corrupt Organizations Act Section 1962 (c)

9.0     The preceding paragraphs are incorporated verbatim herein by reference as if set forth in their entirety.

9.1     This cause of action is brought against each of the Defendants (except LC Scam Corp.) on behalf of the plaintiffs and arises under 18 USC § 1962(c) and (d) of RICO.

9.2     At all relevant times, Defendants (except LC Scam Corp.) were a for-profit entity and constitutes an "enterprise" as that term is defined in 18 U.S.C.S. Section 1961(4), which engages in, and the activities of which affect interstate commerce.

9.3     At all relevant times during the Class Action Period, each of the Defendants (except for LC Scam Corp.) was a "person" as that term is defined in 18 U.S.C. § 1961 (3), as each of the defendants was "capable of holding a legal or beneficial interest in property".

9.4     Each of the Defendants (except for LC Scam Corp.) conducted or participated, directly or indirectly, in the conduct of the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

9.5     Each of the Defendants (except for LC Scam Corp.) committed predicate offenses under Section1961(1)(B), to wit, numerous counts of bank fraud under 18 U.S.C. § 1344, mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343 and a violation of 18 U.S.C.§ 1960 as described above.

9.6     Each of the Defendants engaged in a pattern of racketeering activity as defined by 18 U.S.C. § 1961 in that they conspired to maintain a pattern and/or practice of marketing financial products, to whit: Letters of Credit, over the Internet without any intent of issuing complying documents, or refunds,  for said non-conforming products and with the intent to improperly increase their market share at the expense of Plaintiffs and to lure away Plaintiffs and other similar corporations from purchasing said products from other distributors and websites who sell similar products over the Internet.

9.7     The pattern of racketeering activity referred to above consisted of a variety of schemes which all had the same specific intent, namely to use fraudulent means and unlawful influence to enrich Defendants at the expense of Plaintiffs and other members of the Class.

9.8     These acts of racketeering activity were continuous and related to one another by virtue of common participants, to wit each of the Defendants (except for LC Scam Corp.); the common victims: Corporate Funding Partners' online customers; and the common purpose and common result of improperly enriching Defendants' at the expense of the Plaintiffs and other similar purchasers dealing in interstate and international commerce. Because Defendants performed more than two acts of racketeering activity that were continuous, related and caused substantial injury to Plaintiffs and other similar purchasers dealing in interstate and international commerce these acts constituted a pattern of racketeering activity within the meaning of RICO, 18 U.S.C. § 1961(5).

9.9     The unlawful pattern of racketeering activity has been committed through the vehicle of the enterprise, to wit Corporate Funding Partners. The enterprise had an ascertainable decision-making structure by utilizing the management organization of Corporate Funding Partners.

9.10    Corporate Funding Partners operated and managed the enterprise and upon information and belief also conducted a legitimate business activity, to wit, online sales of letters of credit. Throughout the relevant periods, Defendants (except LC Scam Corp.) conducted the enterprise through a pattern of racketeering activity within the meaning of RICO, 18 U.S.C. § 1961(5) and § 1962(c), in violation of RICO, 18 U.S.C. § 1962(c).

9.11    Defendants have (a) used or invested the proceeds of the income derived from the pattern of racketeering activity to establish, operate and acquire an interest in any and/or all of the companies constituting the enterprise; (b) acquired an interest or control of the enterprise through a pattern of racketeering activity; and (c) conducted the affairs of that enterprise through a pattern of racketeering activity.

9.12    Each of the Defendants (except LC Scam Corp.) also conspired to violate 18 U.S.C. § 1962(a), in violation of 18 U.S.C. Section 1962(d).

9.13    Plaintiffs and other consumers have suffered damages, which were the direct, foreseeable, and proximate result of the defendants' materially misleading acts and practices.

9.14    In addition, Defendant's deceptive practices are likely to continue to deceive thousands of persons via the internet who will also be injured thereby.

9.15    By virtue of the foregoing, Plaintiffs have been damaged, jointly and severally, for treble damages in the amount to be ascertained at trial.


## 10.  Continental and Plastitex Count 4: Deceptive Trade Practice


10.1    The preceding paragraphs are incorporated verbatim herein by reference as if set forth in their entirety.

10.2    That Defendants' misrepresentations are misleading in that they represent to their clients that they will provide letters of credit that will conform to the requirements of a transaction, when in fact they will not.  Defendants know this to be true as in each instance they require the transactional documents to issue a letter of credit, and then issue letters which do not conform to the transactional documents. These misrepresentations constitute a deceptive trade practice under the provision of Gen. Bus. L., Section 349.

10.3    Gen. Bus. L., § 349(h) provides for a private right of action by any person who has been injured by a violation of Gen. Bus. L. § 349(a).

10.4    Upon information and belief, Plaintiffs and members of the Plaintiffs' Class had suffered damages, which were the direct, foreseeable, and proximate result of the Defendants' materially misleading acts and practices.

10.5    By virtue of the foregoing, Plaintiffs and members of the Plaintiffs' Class have been damaged, jointly and severally, in the amount to be ascertained at trial.


## 11.  Continental and Plastitex Count 5: Fraudulent Inducement

11.1     The preceding paragraphs are incorporated verbatim herein by reference as if set forth in their entirety.

11.2     Defendants, knowingly or recklessly, made false and misleading representations by falsely representing that their letters of credit would be issued as confirmed letters of credit, when they knew that they would not be confirmed letters. These misrepresentations are material to the plaintiffs and the other members of the Class because they caused them to enter into the transaction with Corporate Funding Partners, and to pay funds for the letters of credit.

11.3     Defendants made these false representations and omissions with the knowledge that they were false and misleading and with the intent that they were relied upon by persons who were deciding whether to secure a letter of credit through Corporate Funding Partners, LLC.

11.4     The plaintiffs and the other members of plaintiff's Class believed these representations to be true and relied on Defendants' false representations when making their decision to further the transaction. The plaintiffs and the other class members have thereby been injured because they have not been provided with the benefit of the bargain and received a non-conforming letter of credit.

11.5     By virtue of the foregoing, plaintiffs have been damaged, jointly and severally, for treble damages in the amount to be ascertained at trial.


## 13. Class Action

13.0     The preceding paragraphs are incorporated verbatim herein by reference as if set forth in their entirety.

13.1     That this civil action is brought as a class action against Defendants pursuant to Federal Rules of Civil Procedure 23(a)(1)-(4), 23(b)(1), (2) or (3) and case law thereunder on behalf of themselves and all others similarly situated who comprise the following class (the "Class"), defined as follows:
**All persons who purchased Letters of Credit from Defendant Corporate Funding Partners and required a confirmed letter of credit or a letter of credit from a top 25 world bank, and who are interested in pursuing this lawsuit.   The Class Period is the period from January 2007 to the present.**
13.2     This action has been brought and is properly maintainable as a class action, pursuant to Federal Rules of Civil Procedure 23(a)(1)-(4), 23(b)(1), (2) or (3), and case law thereunder.

13.3     **Numerosity of the Class** - Fed. R. Civ. P. 23(a)(1):  Although the exact number of class members cannot be ascertained, they are so numerous and geographically dispersed that joinder of all class members is impracticable. The precise number of Class members and their addresses is unknown to Plaintiffs but can be readily determined from inspection of records maintained by Defendant Corporate Funding Partners. Class members may be notified of the pendency of this action by mail, supplemented (if deemed necessary or appropriate by the Court) by published notice.

12

13.4    **Existence and Predominance of Common Questions of Fact and Law** – Fed. R. Civ.P. 23(a)(2); 23(b)(3):  There are common questions of law and fact involved herein which predominate over any questions affecting only individual members of the class.   The common question of law and fact include, but are not limited to the following:

a.    whether Defendants violated Section 349 of the New York General Business Law (Gen. Bus. L.) in that they engaged in deceptive acts or practices in the conduct of their business;

b.    whether Defendants engaged in business practices in violation of the RICO act;

c.    whether Defendants violated Gen. Bus. L., Section 350 by engaging in false advertising in the conduct of their businesses;

d.    whether Defendants committed fraud by advertising and selling financial products under the guise that the products are fit for the use intended knowing that in fact the financial products were defective and/or unfit for the intended use;

e.    whether Defendants were unjustly enriched at the expense of Plaintiffs and the Class;

f.    whether Defendants refused to reimburse consumers when the financial products issued by Defendant were not fit for their intended use;

g.    whether Defendants acted knowingly, as alleged herein;

h.    whether Plaintiffs and the Class are entitled to restitution of all monies acquired by Defendant from Plaintiffs and the Class and the general public as a result of Defendant's unlawful conduct, and, if so, the appropriate measure of damages;

i.    the appropriate form of injunctive, declaratory and monetary relief.

13.5    **Typicality** - Fed. R. Civ. P. 23(a)(3):  Plaintiffs' claims are typical of those of the Class in that plaintiffs are members of the Class and have no known interest that are antagonistic to or contrary to the interest of the Class.

13.6    **Adequacy** - Fed. R. Civ. P. 23(a)(4):  Plaintiffs will fairly and adequately protect the interest of the members of the class because their interests do not conflict with the interests of the Class members they seek to represent.  Plaintiffs have retained competent counsel experienced in class litigation and intend to prosecute this action vigorously.

13.7    **Superiority** - Fed. R. Civ. P. 23(b)(3):  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Plaintiffs know of no difficulty to be encountered in the management of this action which would preclude its maintenance as a class action.  Furthermore, since the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it impracticable for the class members to seek redress individually or the wrongs they have suffered.

13.8    In the alternative, the Class may be certified under the provisions of Fed. R. Civ. P. 23(b)(1) and/or 23(b)(2) because:

a.   the prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Defendant;

b.   the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c.   Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

## 14.  Attorney Fees

14.0    As a result of defendant's breach, Plaintiffs retained an attorney and seeks reimbursement for their reasonable attorney fees, as authorized by the RICO act, and by any other remedy available at law or in equity.

## 15.  Damages

15.1    As a direct and proximate result of defendant's breach, plaintiff suffered the following damages:

a.   Any and all amounts paid by the Plaintiffs for non-conforming letters of credit.

b.   Reasonable expenses in reliance on the Defendant's performance of the contract.

c.   Loss of net profits.

d.   Punitive Damages.

e.   Pre-judgment interest, and post judgment interest.

f.   Unliquidated damaged within the jurisdictional limits of this court.

## 16, Jury Demand

16.0    Plaintiffs demand a jury trial.

## 17. RICO STATEMENT

17.0    The following RICO Statement is intended to more clearly analyze and state the facts of this case based on current information. Plaintiffs are relying all of the information contained within this Complaint and attached to it to assert theier RICO claim.  Where fraud is not involved the pleading standard is the "reasonable inquiry" required by Rule 11, of the Federal Rules of

Civil Procedure, where fraud is alleged, it shall, and has been done so to comply with the requirements of Fed. R. Civ. P. 9(b):

17.1    The unlawful conduct described in this complaint is actionable under violation of 18 U.S.C. § 1962 (c), in that is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

17.2    The association-in-fact enterprise of which Plaintiffs complain consists of the named defendants, and may have other players or parties that have not yet surfaced.  The known parties are named below, and for the purposes of description, the association-in-fact enterprise will be hereafter referred to as the "L/C Scam Corp."  The scheme dates as far back as 2007 as identified in the Great Eagle matter above, and is ongoing through today.

    A.  Corporate Funding Partners seems to be at the head of the hierarchy of the L/C Scam Corp.  They were responsible certainly for the portions of the scheme dealing with Letters of Credit.  It is alleged that they represented that they had the connections and the expertise to issue confirmed letters of credit from top 25 world banks, when they in fact could not.  They were also responsible for hooking in new alleged customers who would fall prey to their scheme, dividing out the profits, and in general giving the appearance of a credible, legitimate business entity.

    B.  Caren Raphael, President of Corporate Funding Partners, supervised, directed, and assisted in carrying out the portions of the scheme relating to the issuance and application for letters of credit.  Upon information and belief she was responsible for approving all

Letters of Credit and had final oversight on all corporate matters, approved all payments to the parties involved in the L/C Scam Corp. Ms. Raphael received and reviewed each of the documents supplied to Corporate Funding Partners allegedly in order to ensure that the Letters of Credit would comply with the underlying transaction.  In reality it was to make sure that the Letters of Credit issued would not in fact comply with the terms of the underlying transactions.  Ms. Raphael represented to both Plaintiffs that the letters of credit issued would conform to the transactional documents submitted to Corporate Funding for the initial issuance of the Confirmed, to 25 World Bank letters.

C.  Joseph Lau, Chief Processing Officer, supervised, directed, and assisted in carrying out the scheme.  Mr. Lau was responsible for the intake of all necessary paperwork.  He was to fill out forms to obtain the Letters of Credit and pass those forms onto Caren Raphael. Mr. Lau received and reviewed each document supplied for each of the transactions complained of in this matter. The documents reviewed specified the type of letter required.  Mr. Lau represented to both Plaintiffs that the letters of credit issued would conform to the transactional documents submitted to Corporate Funding for the initial issuance of the Confirmed, to 25 World Bank letters .Mr. Lau made those representations knowing that the letter of credit issued would not conform to the requirements of the transaction.

D.  Pablo Antoniazzi – An agent of Corporate Funding Partners is also an owner and an officer of Green Pampas, Inc.  Mr .Antoniazzi was responsible for bringing in business to the LC Scam Corp..  He arranged for the initial failure of the first Letters of Credit applied for so that Corporate Funding, Raphael, Lau, Green Pampas, and he could garner additional funds through future fraudulent transactions.  Namely, once the initial Letter of

Credit was issued with terms that did not conform to those represented, or required by the transaction on both the Continental Petroleum Transaction, and the Plastitex transaction, Antoniazzi would then match the duped entities with new sellers of urea (or whatever product was part of the transaction), and then Corporate Funding Partners would issue letters of credit for those transaction.  The second transaction would fall through either because of the letter's unworkable terms, or because of the failure of the supplier to deliver.  This process was repeated as many times as possible to gather as much money as possible from each individual "client" of the LC Scam Corp.

E.   Green Pampas, Inc. – The straw purchaser element of this scheme is partially owned by Pablo Antoniazzi, and operated by Antoniazzi together with the other officers and directors of Green Pampas, Inc.  When Urea was called for and a sham corporation was needed Green Pampas, Inc played their role along with Antoniazzi.  Antoniazzi exerting his control over the entity Green Pampas, Inc would send out documents such as the contracts in this matter to give the appearance to the victims of L/C Scam, Inc. that this was a legitimate business deal.  This was done with the knowledge of all Defendants that Green Pampas, Inc would never supply Urea.

17.3   Some of the victims of this conspiracy are identified as the Plaintiffs in this matter.

A. Plaintiff Plastitex was the recipient of a requirements contract in Urea.  They sought professional financial advice to obtain a letter of credit that would conform to their transaction with a supplier of the Urea material.  They fell prey to the scheme described above, and were damaged financially as a result of the actions of L/C Scam Corp.

B. Plaintiff Continental Petroleum Corporation was the recipient of a requirements contract in Urea. They sought professional financial advice to obtain a letter of credit that would conform to their anticipated transaction with a supplier of the Urea material. They fell prey to the scheme described above. They fell prey to the scheme described above, and were damaged financially as a result of the actions of L/C Scam Corp.

C. There are others, such as the Great Eagle International Trade, Ltd., and the Great Eagle USA, Inc. Their letter of credit also required a confirmed letter of credit, drawn upon a top 25 world bank. Great Eagle International Trade, Ltd., and the Great Eagle USA, Inc.v. Corporate Funding Partners, LLC, d/b/a LC.Com, et. al., In the Supreme Court of the State of New York, Kings County, Index No. 12394/10. Plaintiff hereby request judicial notice of the pleadings on file with that court, and hereby notifies the parties of the intent to adduce evidence sworn to, disclosed, or otherwise sent through discovery in that matter.

D. Other unknown victims of the LC Scam Corp., which could possibly include Trifecta Trading, or Trifecta Trading could in fact just be another straw purchaser.

17.5 <u>Boyle</u> sought to clarify the required attributes of an association-in-fact enterprise in order to resolve conflicts that had developed among the courts of appeals over the proper interpretation of the Turkette factors. *Boyle v. United States*, 129 S. Ct. 2237 (2009). In short, Boyle holds that the RICO statute defines an "enterprise" broadly, such that the "enterprise" element of a § 1962(c) claim can be satisfied by showing a "structure," that is, a common "purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Id. at 2244; see id. at 2245 ("[A]n association-in-

fact enterprise is simply a continuing unity that functions with a common purpose."). "[A]fter Boyle, an association-in-fact enterprise need have no formal hierarchy or means for decision-making, and no purpose or economic significance beyond or independent of the group's pattern of racketeering activity." United States v. Hutchinson, 573 F.3d 1011, 1021 (10th Cir.), cert. denied, 130 S. Ct. 656 (2009). In this case the pattern of racketeering consisted of the following acts;

> a. The RICO Predicates in this matter are 18 U.S.C. § 1343, Fraud by wire, radio, or television, and 18 U.S.C. § 1341, Frauds and swindles, namely mail fraud.  Each and every document attached to this complaint that was directed between the Plaintiffs and the Defendants was sent via mail, electronic mail, facsimile, or other methods described by the cited statutes;

> b. Plaintiffs have attached to their complaint the documents themselves which identify the dates of the predicate acts, the participants in the predicate acts and the facts surrounding the predicate acts;

> c. If the RICO claim is based on the predicate offenses of wire fraud, mail fraud, or fraud in the sale of securities, the "circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). The time, place and contents of the alleged misrepresentations, and the identity of the persons who made the alleged misrepresentations and the identity of the persons to whom they made the alleged misrepresentations;

> d. Plaintiffs are unaware of any criminal convictions for the predicate acts;

e. Plaintiffs are unaware of any civil judgments regarding the predicate acts, but have previously identified another civil proceeding regarding the same scheme;

f. Paragraph 7.2 including the subparagraphs thereto together with this complaint thoroughly describes how the predicate acts form a "pattern of racketeering activity"; and

g. Establishes how the alleged predicate acts relate to each other as part of a common plan.

17.6    Plaintiffs allege upon information and belief that Corporate Funding Partners, Antoniazzi, Lau, Raphael, and Green Pampas together and separately played roles in the association in fact enterprise described above.  Plaintiffs believe that the activities described herein are in addition to their normal course of business with the possible exception of Green Pampas.  Plaintiffs assert upon information and belief that Green Pampas is a straw company with no assets or income, that is simply used for its name and its website to further perpetrate the LC Scam Corp. described herein.  Plaintiffs' assert based on information and belief that the everyday activities of Corporate Funding Partners, Antoniazzi, Lau, and Raphael may include both legitimately issued letters of credit, and fraudulently issued.  These legitimate enterprises are again upon information and belief are in regards to Letters of Credit that do not require confirmation or are not drawn upon a top 25 world bank.

17.9    Corporate Funding Partners, Antoniazzi, Lau, Raphael, and Green Pampas all derive income from these activities.  Corporate Funding Partners pays Lay and Raphael salaries that are at least in part, possibly wholly, derived from RICO violations.  Funds come in through either the Corporate Funding Partners accounts and are distributed in relation to the respective parties to the scheme.  Green Pampas, the straw supplier here, can be demonstrated to have received certain

benefits through the payments made by Plastitex in Plas. 70-73. Further, at least one of the owners of Green Pampas, Pablo Antoniazzi can be shown to have derived income through monies paid to him by Corporate Funding Partners.

17.10   The LC Scam Corp. is advertized through the internet, and designed to prey solely on those engaged in interstate and foreign commerce. The letters of credit themselves are mechanisms designed to foster interstate and foreign commerce by definition. The income derived would be used either to further the scheme, in which event it remained in the coffers of either Corporate Funding Partners or Green Pampas, or the income would be distributed to the members of the conspiracy through the auspices of payroll, commissions, wages, earnings, dividends, or securities.

17.11   The preceding paragraphs have described the LC Scam Corp. in terms of the participation by the individual and corporate defendants. Their actions can be show to display a specific intent to defraud in that they misled, misinformed, and outright lied to their victims for pecuniary gain. (See 17.2) The Defendants (collectively) used the United States wires or mails in furtherance of their scheme to transmit the document attached to this complaint, and to transmit monies between and amongst themselves.

17.17. Plaintiffs damages in these matters include the lost profits from their transactions, the monies spent in correcting, re-correcting, and opening any letters of credit, Post judgment, and prejudgment interest, attorneys fees, unliquidated damages, reliance damages, benefit of the bargain damages, and any other damages to which they may show this court that they are legally entitled to.

## 18. Prayer

18.0        WHEREFORE, PREMISES CONSIDERED, PLAINTIFFS respectfully

requests this Honorable Court for the following relief: That upon final hearing and trial hereof,

this Honorable Court grant to the Plaintffs such relief as to which they may show themselves

justly entitled, either at law or in equity; either general or special, including declaratory

judgment, judgment against the CORPORATE FUNDING PARTNERS, LLC AND PABLO

ANTONIAZZI, AN INDIVIDUAL, CAREN RAPHAEL, JOSEPH LAU, GREEN PAMPAS,

INC. for actual attorney's fees, cost of suit, mental anguish, statutory penalties, and prejudgment

and post judgment interest, including judgment for additional damages and punitive damage

under the facts set forth in this or any amended pleading.


Respectfully submitted,


V. GONZALEZ & ASSOCIATES, P.C.
121 North 10th Street
McAllen, Texas 78501
Telephone: (956) 630-3266
Facsimile: (956) 630-0383


_____
FREDERICK J. CASTRO, ESQ.
Attorney In Charge
Texas State Bar No.24045628
Southern District of Texas Admission No. 589577
VICENTE GONZALEZ
Texas State Bar No. 00798215
New York State Bar No. 4813655
Southern District of Texas Admission No. 22796
ATTORNEYS FOR PLAINTIFFS